*348 GRIFFIN, Circuit Judge.
Plaintiff Barbara Saulter appeals the district court’s order granting defendant Detroit Area Agency on Aging’s (“DAAA’s”) motion for summary judgment and dismissing in its entirety her employment discrimination action alleging violations of state and federal law. For the reasons that follow, we affirm in part and reverse in part.
I.
The DAAA is a Michigan non-profit corporation that provides a wide array of services to senior citizens in the Detroit area. The services include home care, employment workshops and training, health-insurance counseling, and management of the Detroit Meals on Wheels program, which provides annually over 600,000 home-delivered meals to seniors at nearly forty different congregate sites. In order to provide these services, DAAA is completely dependent on federal and state funding, as well as some private fundrais-ing. Consequently, DAAA’s budget fluctuates based upon the amount of available funds designated for its programs.
In September 2006, DAAA hired Barbara Saulter, a registered dietician (“RD”), as its nutrition service manager. In this capacity, she oversaw the Meals on Wheels and Medicaid Waiver programs. Saulter was in regular contact with the two vendors that prepared the meals. Saulter’s duties included reviewing menus and ensuring that the vendors were in compliance with their contractual obligations and the regulatory standards of both the state and federal governments.
During her employment, Saulter dealt with numerous instances of noncompliance by these vendors, including the use of inappropriate and unsanitary utensils, health-code violations, substandard food and meal preparation, and failed deliveries. Even though, by Saulter’s own admission, DAAA supervisors followed up on her incident reports and most violations were corrected, she nonetheless claimed that “expressing [her] concerns [to DAAA administrators] seemed to, at times, fall on deaf ears.” And although Saulter did not report these violations to anyone outside of the agency, she felt that “something needed to be done. Some additional outside help or something needed.” Saulter testified that her reports were sometimes changed by her supervisors and violations were omitted from the final report; on other occasions, she was asked to edit her reports and eliminate certain portions, although she could not recall or give specific examples of such alterations or omissions.
In 2008, the Office of Services to the Aging (“OSA”), which partially funded the Meals on Wheels program, directed that the congregate meal sites should become self-managed, meaning that DAAA no longer would have its employees on site serving the meals and managing the daily operations. In addition, issues involving contract compliance between DAAA and the sites were eventually turned over to DAAA’s contract management department. Thus, Saulter’s supervision of the sites effectively ended in October 2009.
In the fall of 2009, DAAA implemented “Zero-Based Budgeting,” an administrative review of each department and all individual positions, in an effort to increase efficiency and lower costs due to budgetary constraints. As part of this initiative, each employee was required to document their individual job responsibilities and assign time factors to each duty. In November, DAAA President and CEO Paul Bridgewater announced to the staff that changes would be made to more closely align future funding with services.
*349 The formal review of Saulter’s position indicated that she was burdened with too many administrative tasks. In December 2009, with Saulter’s support, DAAA hired a senior nutrition assessor to supervise the other nutrition assessors and perform the administrative duties that consumed much of Saulter’s time. In addition, responsibility for coordinating the holiday Meals on Wheels program was now shared by several departments. Consequently, by the end of 2009, Saulter had very few administrative responsibilities left.
On December 29, 2009, Saulter requested and began a medical leave of absence, citing the stress of taking care of her aging father, severe intestinal pain, and sinus problems in her requisite documentation for approval of the leave under the Family and Medical Leave Act (“FMLA”), 29 U.S.C. § 2601 et seq. In January 2010, she notified DAAA by telephone of her intention to file for short-term disability in order to extend her leave and of her belief that her condition was work-related. Grace Grabreck, DAAA’s human resources manager, sent Saulter the necessary application forms in early February 2010.
During Saulter’s absence, DAAA began to implement departmental and positional realignment pursuant to its Zero-Based Budgeting review. The reorganization was agency-wide, impacting department directors as well as lower-level employees. Substantial restructuring occurred in the community access, care management, and common services departments. Gale Simmons, vice president of community services, concluded that all of Saulter’s remaining duties were being adequately covered while she was on leave, but in light of OSA guidelines that required an RD (but not necessarily a DAAA employee) to approve the menus at the congregate meal sites, DAAA sought a temporary independent contractor to fill this role during Saulter’s extended leave. In the meantime, DAAA relied upon the two vendors’ RDs to perform — free of charge — the meal planning and to prepare the educational materials for the congregate sites.
By March 2010, Simmons determined that as a result of DAAA’s reorganization efforts, DAAA no longer needed a full-time nutrition service manager because “the pieces of responsibility ... had been assigned elsewhere.” In memoranda dated March 24, 2010, both Simmons and Gloria Hicks Long, DAAA’s senior vice president and chief operating officer, made recommendations to Bridgewater concerning the agency-wide restructuring. Their recommendations included, inter alia, the elimination of Saulter’s position in favor of a part-time independent-contractor RD in light of changes in the community services department, the transfer of congregate-site management monitoring functions to the contract management department, the addition of a senior nutrition assessor position, and the addition of a director of healthy aging position. On March 29, 2010, Simmons, Long, and Grabreck jointly sent a memorandum to Bridgewater in which they reaffirmed these reasons to eliminate Saulter’s position. They suggested that, pending a release from her doctor, “Saulter will be invited to apply for the [ijndependent [c]ontractor arrangement.”
One day later, on March 30, 2010, Bridgewater notified Saulter by letter of the decision to eliminate her position as of April 9, 2010, and replace it with an independent contractor RD. Bridgewater requested that Saulter immediately contact Grabreck and Simmons to discuss these changes. On the same date, Saulter filed an application for mediation or a hearing with the Michigan Workers’ Compensation Agency to initiate a workers’ disability *350 compensation claim, citing “[ejxeessive hours and assignments; along with job stress caused nervous system injury with functional overlay.” She returned to work from her medical leave on April 5, 2010.
Upon her return, Saulter met with Long, Grabreck, and Simmons. They informed plaintiff about the part-time independent contractor RD position that was being created and encouraged her to apply. DAAA also anticipated the creation of a new position entitled “Director of Wellness” to handle nutrition and healthy aging issues. Saulter discussed the possibility of interviewing for this position once it was formalized, and she submitted her resume indicating her interest in both positions. By e-mail, she requested updates on the hiring process for these positions.
The restructuring and reduction-in-force decisions were made known to the entire DAAA staff in a memorandum from Long, on behalf of Bridgewater, issued on April 9, 2010. In addition to Saulter’s position, DAAA also eliminated the following positions: Vice President of Community Access, Wait List Management in Community Access, Support Staff in Community Access, Director of Planning and Provider Development, and Director of Community Access, and shifted other employees to different departments. The memo noted that “Ms. Saulter is considering the Independent Contractor position.” Bridgewa-ter made the recommendation to the DAAA Board of Directors that they should enter into an independent contractor agreement with an RD in an amount not to exceed $8,500 for the period of May 1, 2010 to September 30, 2010. The RD would provide menu approval, nutrition education, and additional food service consultations.
Saulter and other applicants interviewed for the independent-contractor RD position. Ultimately, however, DAAA opted to continue using the vendors’ RDs to perform the required services and did not hire anyone for this position.
In early May 2010, Grabreck scheduled an interview with Saulter for the director of wellness position, but she subsequently cancelled it because DAAA’s executive team had reassessed its needs and determined that it did not need a wellness director. Instead, DAAA used its funding to create an entirely different position that focused on business development. Although Grabreck never personally notified Saulter about this position because of its very different requirements, the position was openly advertised and five or six candidates were interviewed. Saulter never applied. The position was filled in July 2010 by a candidate who had prior extensive experience working in this field.
On July 8, 2010, Saulter filed a state-court complaint in Wayne County Circuit Court alleging violations of Michigan’s Whistleblowers’ Protection Act (“WPA”) and Worker’s Disability Compensation Act (“WDCA”). She then amended her complaint to bring additional claims for violations of state and federal discrimination laws, including the Michigan Elliott-Larsen Civil Rights Act (“ELCRA”), the Americans with Disabilities Act (“ADA”), and the FMLA.
Defendant removed the case to federal court and moved for summary judgment on all counts. On August 31, 2012, the district court issued a written opinion and order granting summary judgment in favor of DAAA and dismissing the case in its entirety. Saulter now appeals the district court’s judgment with respect to her WPA, WDCA, and FMLA claims; she does not challenge the dismissal of her ADA and ELCRA claims.
II.
We review the district court’s grant of summary judgment de novo and its find *351 ings of fact for clear error. U.S. ex rel. Wall v. Circle C Const, L.L.C., 697 F.3d 345, 350 (6th Cir.2012). Summary judgment is appropriate when, viewing the facts and drawing all inferences in the light most favorable to the nonmoving party, “the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.” Id. at 351 (internal citation and quotation marks omitted). “A genuine issue of material fact exists when there is sufficient evidence for a trier of fact to find for the non-moving party[;]” however, “[a] ‘mere scintilla’ of evidence ... is not enough for the non-moving party to withstand summary judgment.” Id. (citations and internal quotation marks omitted).
III.
A.
Saulter alleges in Counts I and II of her first amended complaint that DAAA violated Michigan’s WPA by (1) terminating her employment after she reported violations of governmental regulations and standards by vendors who delivered food to the agency’s senior clientele; and (2) failing to interview and/or employ her for certain positions after her termination, thus committing a “continuing violation” of the WPA. The WPA provides in relevant part:
An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee’s compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action.
M.C.L. § 15.362.
The WPA “establishes] a cause of action for an employee who has suffered an adverse employment action for reporting or being about to report a violation or suspected violation of the law” by either their employer or fellow employees. Whitman v. City of Burton, 493 Mich. 303, 831 N.W.2d 223, 229 (2013). Its underlying purpose is the protection of the public, by in turn “protecting the whistleblowing employee and by removing barriers that may interdict employee efforts to report violations or suspected violations of the law.” Dolan v. Continental Airlines/Continental Express, 454 Mich. 373, 563 N.W.2d 23, 26 (1997) (footnote omitted).
In order to establish a prima facie case under the WPA, “a plaintiff need only show that (1) he or she was engaged in protected activity as defined by the act, (2) he or she suffered an adverse employment action, and (3) a causal connection exists between the protected activity and the adverse employment action.” Whitman, 831 N.W.2d at 229 (footnote omitted). The causation element is at the core of the dispute in the instant case. “[T]he evidence presented will be sufficient to create a triable issue of fact if the jury could reasonably infer from the evidence that the employer’s actions were motivated by retaliation.” Shaw v. Ecorse, 283 Mich. App. 1, 770 N.W.2d 31, 40-41 (2009) (per curiam) (citation and internal quotation marks omitted). However, “ ‘circumstantial proof must facilitate reasonable inferences of causation, not mere speculation.’ ” *352 Id. at 40 (quoting Skinner v. Square D Co., 445 Mich. 158, 516 N.W.2d 475, 480 (1994)).
“To prevail, [a] plaintiff ha[s] to show that his employer took adverse employment action because of plaintiffs protected activity, [not] ... merely ... that his employer disciplined him after the protected activity occurred.” West v. Gen. Motors Corp., 469 Mich. 177, 665 N.W.2d 468, 472 (2003). Thus, a plaintiff must show more than simply a coincidence in time between the adverse employment action and the protected activity — temporal proximity, standing alone, does not suffice to establish causation. Debano-Griffin v. Lake Cnty., 493 Mich. 167, 828 N.W.2d 634, 639 (2013); West, 665 N.W.2d at 472-73. However, “temporal proximity, coupled with some other indication of termination on the basis of a protected activity, can satisfy the causation element.” Kuhn v. Washtenaw Cnty., 709 F.3d 612, 629-30 (6th Cir.2013) (citing Henry v. City of Detroit, 234 Mich.App. 405, 594 N.W.2d 107, 112-13 (1999)).
Under the McDonnell Douglas[1] burden-shifting framework applied by the Michigan courts to WPA claims based on circumstantial evidence, like the case before us, “[o]nce a plaintiff establishes a prima facie case, a presumption of [retaliation] arises because an employer’s adverse action is more likely than not based on the consideration of impermissible factors ... if the employer cannot otherwise justify the adverse employment action.” Debano-Griffin, 828 N.W.2d at 638-39 (citations and internal quotation marks omitted). “The employer, however, may be entitled to summary disposition if it offers a legitimate reason for its action and the plaintiff fails to show that a reasonable fact-finder could still conclude that the plaintiffs protected activity was a ‘motivating factor’ for the employer’s adverse action.” Id. at 639. “A plaintiff must not merely raise a triable issue that the employer’s proffered reason was pretextual, but that it was a pretext for unlawful retaliation.” Id. (citation, internal quotation marks, and brackets removed).
In recent years, the Michigan Supreme Court has clarified several important aspects of the WPA. In Brown v. Mayor of Detroit, 478 Mich. 589, 734 N.W.2d 514 (2007), the court held that “[t]he WPA does not require that an employee of a public body report violations or suspected violations to an outside agency or higher authority to receive the protections of the WPA [and] [fjurther, the WPA does not provide that an employee who reports violations or suspected violations receives the protections of the WPA only if the reporting is outside the employee’s job duties.” Id. at 518. And in Whitman, the Michigan Supreme Court “clarified] that a plaintiffs motivation is not relevant to the issue whether a plaintiff has engaged in protected activity and proof of any specific motivation is not a prerequisite to bringing a claim under the WPA.” Whitman, 831 N.W.2d at 234. “[A]s long as a plaintiff demonstrates a causal connection between the protected activity and the adverse employment action, the plaintiffs subjective motivation for engaging in the protected activity in the first instance is not relevant to whether the plaintiff may recover under the act.” Id. at 233.[2]
*353 B.
Citing Jennings v. Cnty. of Washtenaw, 475 F.Supp.2d 692, 710 (E.D.Mich.2007), and Bush v. Detroit Sch. Dist., No. 268862, 2006 WL 2685088, at *4-5 (Mich.Ct.App. Sept. 19, 2006) (unpublished), the district court held that the WPA does not apply where an employee reports suspected violations as part of his or her required duties. Following these cases, the court held that Saulter was not engaged in a protected activity when she reported the multiple vendor violations to the DAAA during the course of her employment because her goal was not to alert the public of the vendors’ wrongdoings; rather, it was simply part of her compliance with her job duties.
The basic issue of protected activity aside, the district court further opined that Saulter failed to present sufficient evidence of causation to establish a prima facie case. Although Saulter argued that she was terminated shortly after she reported the vendors’ irregularities, the court held that the temporal connection alone was insufficient to establish causation where Saulter did not present any additional evidence linking her reporting of the vendors’ violations to her termination. The district court noted that “DAAA management readily followed up on Saulter’s concerns throughout the years, indicating no hostility against these types of reports.” Alternatively, even assuming arguendo that Saulter established a prima facie case, the court held that DAAA presented a legitimate, non-retaliatory reason for her discharge — implementation of the Zero-Based Budgeting plan and the resultant extensive reorganization of the agency, which impacted not only Saulter but many other employees as well. The district court cited Saulter’s dearth of evidence that this reason was offered as a mere pretext for discriminatory conduct and held, therefore, that DAAA was entitled to summary judgment on Saulter’s WPA claim.
As a preliminary matter, we agree with Saulter that the district court erred as a matter of law when it concluded that an employee does not engage in a protected activity under the WPA by reporting unlawful conduct to her employer in the course of her normal job duties. This premise is no longer valid following the Michigan Supreme Court’s explicit statement in Brown that “[t]he statutory language renders irrelevant whether the reporting is part of the employee’s assigned or regular job duties.” Brown, 734 N.W.2d at 518; see also Podzikowski v. Twp. of Albert, No. 296083, 2011 WL 3132893, at *5 (Mich.Ct.App. July 26, 2011) (unpublished), and Vandyke v. Leelanau Cnty., No. 286775, 2010 WL 624382, at *6 (Mich.Ct.App. Feb. 23, 2010) (unpublished) (both recognizing that under Brown’s interpretation of the WPA, there is no requirement that the reporting employee must be acting outside the regular scope of his or her employment). Thus, the district court’s reliance on Jennings and Bush to conclude that plaintiff was not engaged in protected activity is misplaced.
Moreover, the fact that Saulter’s “main goal was not to alert the public of the vendors’ wrongdoings[,]” as determined by the district court, is no longer a valid component of the “protected activity” equation under Whitman, 831 N.W.2d at 233 (“[Hjaving a specific primary motivation is neither a prerequisite for bringing a WPA claim nor a factor to be considered in *354 determining whether a plaintiff had engaged in protected conduct.”).
Nonetheless, we agree with the district court that Saulter has failed to establish the causation requirement of a prima facie case, despite Saulter’s protestations to the contrary. Saulter argues that the evidence establishes that her years of attempting to enforce vendor compliance with health code regulations was met with resistance by DAAA. She claims that after citing health code violations by the vendors, she was told by her supervisors that upper management wanted her to rewrite and eliminate portions of her reports, and when she refused to do so, her evaluations were changed by someone else in the agency. Saulter maintains that she “openly indicated” to DAAA that OSA should become involved, because it would find the long record of violations unacceptable. Saulter conjectures that as a result of her actions, “maybe the company [DAAA] viewed me as a troublemaker[.]”
However, Saulter’s generalized allegations are speculative, lacking in detail, and fail to adequately substantiate her claim that she was viewed negatively as a whis-tleblower by DAAA and terminated as a result. During her deposition, Saulter, when asked to review her reports and identify what specific content had been changed or omitted, was unable to do so. Simmons’ uncontradicted testimony, on the other hand, indicates that the editing process was benign and simply a matter of prioritization:
When [Saulter] would go out and do the annual assessment and she would write up her report with the items that she had observed and she cited, I would then sit down with contract management, and we would make a determination as to what would be the best course of action to address each of the concerns that she raised. If it was something that had been an ongoing issue, then it would be put in the assessment letter that would go to the head of [the vendor]. If it was something that hadn’t been an ongoing issue, but was a concern that was noted and needed some type of action, we might say bring this up in the weekly meeting with Valley and have them correct it through that process. If bringing it up in the weekly meetings that didn’t get addressed, then we would send a letter indicating whatever the concerns were and they would need to be addressed that way.
So not every item that was ever noted was immediately flagged as this is an assessment that had to go in the assessment letter. There were different ways of addressing the issues.... If there were other issues that came up during the course of the year, then we would communicate that to them in writing.
Although Saulter asserts that she conveyed to DAAA her intent to contact OSA about the vendor violations, her nebulous testimony in this regard — that she felt “additional outside help” was needed to correct vendor violations and that “something needed to be done” — falls far short of establishing that she reported, or was about to report, these issues to OSA, or that DAAA was objectively aware of her intent to do so. Kuhn, 709 F.3d at 629. Critically, there is no concrete evidence that DAAA supervisors ever reacted negatively to Saulter’s reports or that DAAA believed she would report the vendor violations to another public body in a manner objectionable to DAAA so as to generate hostility or retaliation. Saulter provides no explanation as to why DAAA would frown upon or dissuade her from performing her job, allow vendor violations to persist, or allow its vendors to' escape accountability for issues of noncompliance rather than rectifying these problems.
*355 To the contrary, as the district court found, the evidence shows that DAAA took her concerns seriously. The record is replete with examples of vendor issues flagged by Saulter that were in turn addressed promptly by DAAA through direct contact with the vendors. Saulter readily admitted that in those situations where she identified issues with the vendors, DAAA management followed up on her concerns. Alexander and Simmons both testified that during Saulter’s tenure with DAAA, she performed her job well and whenever she raised issues about the vendors, they pursued these matters and never asked Saul-ter to refrain from reporting any problems in her evaluations. Likewise, Paul Bridge-water characterized Saulter as an effective employee. He testified:
Q. Over the years, Ms. Saulter authored a number of memos in which she was critical of several areas of performance of vendors such as Valley and Unique. Did you see any of those memos?
A. I saw some of those memos.
Q. Do you recall any of them?
A. Yes, I recall some of those memos. Q. Do you recall how you — what was your reaction when you saw those memos?
A. I thought that’s what we had her to do is to monitor those contracts and cite [the vendors] for anything that they were not doing based on the contract agreement.
Q. Did you ever believe that [Saulter] was overreaching in the performance of her duties?
A. No. I think ... we wanted to make sure that she got the best out of those contractors, and again, living up to the contract. And I thought that as long as she kept folks’ feet to the fire, that we [were] going to get a good product, so.
Q. You know anybody at DAAA that share[d] that view?
A. I would hope everybody else in the whole organization shared that view. Because, again, I think the key is that that’s what we hired our contractor compliance officers to do across the board in the sense of — and certainly there is no expectation that our providers are on target all the time. But I think that there were instances that there are problems and that’s what we want, do corrective action. So, no, I did not have any problem with Barbara managing those contracts.
Q. Did it ever come to your attention that Barbara was considering notifying OSA of the continuing violations of those contracts?
A. Nope. I was never aware of that.
Q. Would you have considered her notification to OSA a part of her — a reasonable part of her job activities?
A. We would hope that all of the corrective actions would [take] place internally. I respected Barbara as a professional and I would hope that — and I understand her professionalism, and I was under the impression that those issues and problems were being handled and resolved.... I did not nor did Barbara ever communicate to me verbally or written that she was having difficulties getting issues resolved within her responsibilities.
In sum, there is no evidence in the form of conduct or statements to suggest that DAAA management considered Saulter to be a troublesome whistleblower or that the decision to eliminate her position and discharge her was motivated by resentment over her reporting or being about to report the vendors’ violations of regulations and health standards. Because Saulter has merely shown that she was terminated after the protected activity occurred, not *356 because of it, she has failed to satisfy the causation element of a prima facie case under the WPA. West, 665 N.W.2d at 472-73; see also Buell v. Grand Blanc Twp., No. 303696, 2012 WL 3020795, at *4 (Mich. Ct.App. July 24, 2012) (unpublished) (affirming the grant of summary judgment in favor of the defendant township where there was no evidence that the township was reacting to or relying on the plaintiffs reporting activity when it disciplined and eventually discharged the plaintiff for financial reasons). For this reason, the district court did not err in granting summary judgment in favor of DAAA on Count I of her first amended complaint.
Moreover, even if we assume for the sake of argument that Saulter has surpassed the prima facie hurdle, her WPA claim nonetheless fails for want of evidence of pretext. Significantly, “[t]he fact that a plaintiff engages in a ‘protected activity5 under the [WPA] does not immunize [her] from an otherwise legitimate, or unrelated, adverse job action.” West, 665 N.W.2d at 473.
Here, DAAA articulated a facially legitimate business reason for Saulter’s discharge — its Zero-Budgeting agency reorganization. See Shah v. NXP Semiconductors USA, Inc., 507 Fed. Appx. 483, 492 (6th Cir.2012) (“Evidence of an employer’s business restructuring, which may include the elimination of jobs or termination of otherwise competent employees ... satisfies the employer’s burden of producing a legitimate, non-discriminatory reason for a plaintiffs termination.”); Coleman v. Sun Finan. Grp., 85 F.3d 628, 1996 WL 253880, at *3 (6th Cir.1996) (table decision) (“[W]hen ruling on similar [discrimination] claims under Michigan law, we have held that one legitimate business reason for an employer to discharge an employee is corporate reorganization or reduction in force.”) (citing La Grant v. Gulf & Western Mfg. Co., Inc., 748 F.2d 1087, 1090 (6th Cir.1984)).
Saulter, then, bears the burden of showing that DAAA’s proffered reason “was not the true reason, but was only a pretext for the discharge.” Roulston v. Tendercare (Michigan), Inc., 239 Mich.App. 270, 608 N.W.2d 525, 530 (2000) (per curiam). Pretext may be established in three separate ways, by showing that the proffered reason (1) had no basis in fact, (2) was not the actual reason, or (3) was insufficient to justify the decision. Debano-Griffin, 828 N.W.2d at 640-41. “The soundness of an employer’s business judgment, however, may not be questioned as a means of showing pretext.” Id. at 641 (citation and internal quotation marks omitted).
Saulter has not expressly advanced any of these avenues of rebuttal in her argument before either the district court or this court, but she maintains that there was no economic necessity justifying the reorganization. As evidence that the reorganization was merely a pretext for an illicit motive, Saulter directs our attention to the fact that in 2010, DAAA had more funding (approximately $600,000) than in previous years; DAAA increased the number of enrollees in some of its programs; several managers received pay increases; and new staff was hired throughout the agency.
However, these facts, considered separately or in combination, do not create a genuine issue of material fact on the question of pretext. The uncontroverted evidence before the district court showed that the Zero-Based Budgeting plan, at least a year in the making, was a comprehensive reorganization of all DAAA departments to address not only long-term budgetary restrictions, but to improve efficiency as well. Saulter’s cited facts nei *357 ther speak to the cost savings realized from the reallocation of resources nor to the goal of improving performance by-shifting tasks and, albeit at Saulter’s and other employees’ expense, eliminating several positions and transferring departmental duties. Moreover, as previously noted, the part-time independent contractor RD and director of wellness positions that Saulter applied for never materialized because DAAA determined that the former was best filled by the vendors’ own RDs, and the latter position was not needed. Although Saulter contends that she was not considered for the newly-created business development post, she never applied for this publicized position.
“[A] plaintiff cannot simply show that the employer’s decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.” Debano-Griffin, 828 N.W.2d at 640 (citation and internal quotation marks omitted). Saulter has submitted nothing to show that DAAA’s given reason for her discharge was not real, unworthy of credence, or otherwise pretextual. Consequently, there is insufficient evidence from which a reasonable jury could conclude that retaliation because of her protected activities under the WPA was DAAA’s true reason for the adverse employment decision. Cf Hamilton v. Starcom Mediavest Group, Inc., 522 F.3d 623, 630 (6th Cir.2008) (affirming the grant of summary judgment in favor of the employer in an ERISA retaliatory discharge suit where there was no evidence that the stated reason for the employee’s discharge, a massive reorganization and the hiring of more experienced candidates, was pretextual); Campbell v. Washington Cnty. Pub. Library, 241 Fed. Appx. 271, 277 (6th Cir.2007) (holding in context of FMLA retaliation claim that “[the] evidence cannot show that the Library juggled around positions merely to camouflage [the plaintiffs] adverse employment action as a reorganization. Indeed, the reorganization had an impact on almost every part of the Library system, took careful planning, and led to the demotion of another employee and a reduction of the Library’s hours.”); Upshaw v. Metro. Nashville Airport Auth., 207 Fed.Appx. 516, 520-21 (6th Cir.2006) (holding that a former ' metropolitan airport employee whose position was eliminated as part of an airport reorganization failed to show that the reorganization, which increased employees but had begun years earlier to streamline operations and increase cost-effectiveness, was merely a pretext to strip him of his civil-service protections); Schuch v. Savair, Inc., 118 Fed.Appx. 16, 23 (6th Cir.2004) (affirming summary judgment in favor of employer in ADEA discrimination suit because the elimination of the plaintiffs position as part of a cost-saving reorganization effort was a legitimate, nondiscriminatory reason for his termination and the fact that the employer “might have chosen to reduce costs in a number of different ways [rather than terminate the plaintiffs employment] ... does not establish that a cost-reduction effort was not the actual reason for [his] termination”). Accordingly, Saulter has failed to create a genuine issue of material fact on her retaliation claim under the WPA.
C.
In Count II of her amended complaint, Saulter alleges that DAAA’s failure to interview and/or employ her in certain positions after her termination constitutes a “continuing violation” of the WPA. The continuing violations doctrine allows discriminatory acts that occur outside of the statute of limitations to be actionable in certain instances where the act is not a *358 discrete discriminatory act, and tolls the applicable limitations period until a reasonable person would have become aware of the facts supporting the claim of discrimination. Nat’l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002); Sumner v. Goodyear Tire & Rubber Co., 427 Mich. 505, 398 N.W.2d 368, 376-80 (1986). Pursuant to this theory, plaintiff contends that DAAA’s allegedly retaliatory actions were part of a continuing course of conduct — “[t]he string of denials of opportunities to [her], including the contractual dietician position, [w]ellness director, and [pjrogram [development director” are each actionable because they are “acts involving the same type of discrimination; recurring, and pervasive to the point of indicating [she] should no longer attempt to assert her right to do business or work for DAAA”— thereby expanding the WPA’s ninety-day limitations period set forth in M.C.L. 15.363(1).
As accurately pointed out by the district court, Saulter’s “continuing violations” claim suffers from several infirmities, not the least of which are the Michigan Supreme Court’s repudiation of the doctrine in employment discrimination cases,[3] and again, the same lack of causation evidence that defeats her WPA retaliatory discharge claim in Count I of her amended complaint. We therefore affirm the district court’s grant of summary judgment on Count II.
IV.
In Count III, Saulter alleges that DAAA violated Michigan’s WDCA by retaliating against her for filing a workers’ disability compensation claim. The WDCA prohibits an employer from “discharging] an employee or in any manner discriminating] against an employee because the employee filed a complaint or instituted or caused to be instituted a proceeding under this act or because of the exercise by the employee on behalf of himself or herself or others of a right afforded by this act.” M.C.L. § 418.301(13) (formerly M.C.L. § 418.301(11)).
Saulter claims that “[t]he adverse personnel actions taken against [her] ... were occasioned by considerations of [her] filing of a workers compensation claim.” While on FMLA leave in January 2010, Saulter indicated in a voicemail to DAAA that she believed her medical condition was work related. In response, on February 12, 2010, Grabreck sent Saulter a form to initiate a workers’ compensation claim. The decision to eliminate Saulter’s position was made on March 24, 2010, almost one week before Saulter actually filed her *359 workers’ compensation claim on or about March 80, 2010.
As is the case with other discrimination statutes such as the WPA, the Michigan courts apply the same prima facie requirements and utilize the McDonnell Douglas burden-shifting framework in cases alleging unlawful retaliation under the WDCA. Cuddington v. United Health Servs., Inc., 298 MichApp. 264, 826 N.W.2d 519, 525 (2012) (per curiam).
Here, the district court granted summary judgment in favor of DAAA on Saul-ter’s WDCA count for three reasons: first, the decision to eliminate her position was made before she filed her claim for workers’ compensation; second, she provided no evidence of a causal connection in any event; and third, the WDCA retaliation provisions did not apply to job rejections that occurred after Saulter’s termination as an “employee.”
On appeal, the parties continue to dispute the district court’s multiple bases for its ruling — particularly whether Saulter’s WDCA claim is foreclosed under Michigan law because it is based on the employer’s anticipation of the filing of a workers’ compensation claim, i.e., Saulter’s position was terminated before she formally filed the claim with the State.[4] However, even if we generously give Saulter the benefit of the doubt on this issue, she has not fulfilled her prima facie burden of demonstrating that the filing of her comp claim was a “significant factor” in her termination. MacDonald-Bass v. J.E. Johnson Contracting, Inc., 493 Fed.Appx. 718, 727 (6th Cir.2012) (per curiam) (citing Truthan v. Butterworth Health Corp., Nos. 211808, 212507, 1999 WL 33327165, at *3 (Mich.Ct. App. Dec. 17,1999)).
Saulter concedes that “the record lacks an admission from [DAAA] as to the relationship of the workers’ compensation filing and the adverse employment action[ ],” but she nonetheless argues that “[t]he timing coupled with the elimination of all opportunities for [her] to have a business relationship with DAAA is sufficient to permit the trier of fact to reject the proffered reasons of [DAAA] and infer discrimination.” We respectfully disagree. The present circumstances parallel MacDonald-Bass and Truthan, in which the courts held that a temporal connection coupled with merely the plaintiffs’ subjective belief regarding retaliation does not constitute sufficient evidence of causation. MacDonald-Bass, 493 Fed.Appx. at 728-29; Truthan, 1999 WL 33327165 at *3. Likewise, here, Saulter has not lived up to her obligation under Fed.R.Civ.P. 56(c)(1)(A) to “eit[e] to particular parts of materials in the record, including depositions, documents, ... affidavits or declarations ... showing that the materials cited do not establish the absence ... of a genuine dispute[,]” and hence she has not established a prima facie case. Even if we presume that she has, her failure to come forth with actual examples of DAAA’s retaliatory animus to counter its legitimate business justification for terminating her position dooms her claim. We conclude that the district court’s grant of summary judgment in favor of DAAA on Count III was not erroneous.
*360 V.
I respectfully dissent, however, from my colleagues’ conclusion that the district court erred in granting summary judgment with respect to Saulter’s FMLA claim. In Count VI of her first amended complaint, she alleges that DAAA violated the FMLA by “including, but not limited to, eliminating the position of Plaintiff while she was on Family Medical Leave, and refusing continuation of employment of Plaintiff in any capacity.”
Under the FMLA, an eligible employee who takes FMLA leave “shall be entitled, on return from such leave — (A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or (B) to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment.” 29 U.S.C. § 2614(a)(1). “If an employer interferes with the FMLA-created right to medical leave or to reinstatement following the leave, a -violation has occurred.” Arban v. West Publ’g Corp., 345 F.3d 390, 401 (6th Cir.2003). “The right to reinstatement guaranteed by 29 U.S.C. § 2614(a)(1) is the linchpin of the entitlement theory because the FMLA does not provide leave for leave’s sake, but instead provides leave with an expectation [that] an employee will return to work after the leave ends.” Edgar v. JAC Prods., Inc., 443 F.3d 501, 507 (6th Cir.2006) (internal quotation marks omitted). Saulter’s claim that DAAA failed to reinstate her following her medical leave is an interference claim under the FMLA (also referred to as an entitlement claim). See 29 U.S.C. § 2615(a)(1) (“It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.”).
“To prevail under the interference theory [of the FMLA], the employee must establish the following: (1) he was an eligible employee; (2) the defendant is an employer; (3) the employee was entitled to leave under the FMLA; (4) the employee gave the employer notice of his intention to take leave; and (5) the employer denied the employee FMLA benefits to which he was entitled.” Wysong v. Dow Chem. Co., 503 F.3d 441, 447 (6th Cir.2007) (internal quotation marks, citations, and alterations omitted). We repeatedly have held that “[a]n employer’s intent is not directly relevant to the entitlement inquiry.” Grace v. USCAR, 521 F.3d 655, 670 (6th Cir.2008). Nonetheless, the right to reinstatement is not absolute, and “employers are permitted to ‘deny restoration to employment’ if they can ‘show that an employee would not otherwise have been employed at the time reinstatement is requested.’ ” Edgar, 443 F.3d at 507 (quoting 29 C.F.R. § 825.216(a)). Accordingly, “an employer need not restore an employee who would have lost his job or been laid off even if he had not taken FMLA leave.” Hoge v. Honda of Am. Mfg., Inc., 384 F.3d 238, 245 (6th Cir.2004). This is because the FMLA provides that the right to restoration “shall [not] be construed to entitle any restored employee to ... any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave.” 29 U.S.C. § 2614(a)(3)(B).
We recently held that it is appropriate to apply the McDonnell Douglas burden-shifting analysis when an employer seeks to prove that it would have terminated the employee’s position regardless of whether she took FMLA leave. See Donald v. Sybra, Inc., 667 F.3d 757, 762 (6th Cir.2012). Thus, “an employer may prove it had a legitimate reason unrelated to the exercise of FMLA rights for terminating *361 the employee” and “the plaintiff [can] rebut the employer’s reason by showing that the proffered reason had no basis in fact, did not motivate the termination, or was insufficient to warrant the termination.” Id. (citing Grace, 521 F.3d at 670). “[T]he law in this circuit is clear that temporal proximity cannot be the sole basis for finding pretext.” Id. at 763.
The district court granted summary judgment to DAAA on Saulter’s FMLA claim because “[e]ven if Saulter is able to establish a prima facie case, the DAAA contends that the termination of her position was part of a legitimate economic decision that would have occurred even if she had not been on leave [and] Saulter has not presented any evidence with which to rebut this proffered explanation[.]” (R. 18, ID 400-01). I agree with the district court’s finding.
DAAA has advanced its agency-wide reorganization as a legitimate reason for its decision not to restore Saulter to her position upon her return from FMLA leave. See Madry v. Gibraltar Nat’l Corp., 526 Fed.Appx. 593, 597 (6th Cir.2013) (“We have previously found that the restructuring of a business was a legitimate, nondiscriminatory reason for terminating an employee who had incidentally taken FMLA leave.”) (citing Skrjanc v. Great Lakes Power Serv. Co., 272 F.3d 309, 315 (6th Cir.2001)); see also Roll v. Bowling Green Metalforming, LLC, 457 Fed.Appx. 458, 461-62 (6th Cir.2012) (holding in FMLA that decision to terminate employee as part of a companywide reduction-in-force was not pretextual under the FMLA).
Saulter has not produced evidence sufficient to convince a trier of fact that the restructuring would not have occurred and her position would not have been eliminated if she had not taken leave. Athough she again cites DAAA’s increased funding, its hiring of employees, and pay increases to management during the course of the reorganization as evidence undermining DAAA’s budgetary justification for her discharge, broader goals were involved in the comprehensive agency-wide reorganization, and it is inappropriate to second guess an employer’s business judgment as a means of establishing pretext. See Ma-dry, 526 Fed.Appx. at 597 (“Reducing labor costs and improving efficiency are valid business reasons for conducting layoffs, even when the degree to which such actions are motivated by economic hardship is debatable.”) (citing Aldridge v. City of Memphis, 404 Fed.Appx. 29, 37-39 (6th Cir.2010); Gatch v. Milacron, Inc., 111 Fed.Appx. 785, 791 (6th Cir.2004)).
Grace Grabreck testified in her deposition that the decision to eliminate Saulter’s position was “a business decision, not specifically addressed to Ms. Saulter ... due to the budget cuts.” Athough Gail Simmons testified that the decision to eliminate Saulter’s position crystalized in March 2010 while Saulter was on FMLA leave, the redistribution of Saulter’s job functions began long before she started her FMLA leave as part of the reorganization rollout. By the time she requested medical leave, Saulter’s responsibilities had been reduced considerably. As indicated in the many directives and memo-randa that were admitted into evidence, the drastic changes that were made to the agency were ongoing during 2009 and 2010 and transpired before, during, and after Saulter’s FMLA leave. The impact of these changes was not isolated to only Saulter, and there is no specific evidence, other than temporal proximity, to suggest that Saulter’s FMLA leave precipitated her termination.
Because Saulter has not provided sufficient evidence to survive summary judgment on her FMLA interference claim, I *362 would affirm the district court’s dismissal of Count VI.
VI.
The judgment of the district court is affirmed as to Saulter’s WPA and WDCA claims. However, for the reasons set forth below in the separate opinion by Judge Moore, joined by Judge Sargus, the district court’s grant of summary judgment on Saulter’s FMLA interference claim is reversed and remanded for further proceedings.

. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

. In so holding, the Michigan Supreme Court expressly repudiated oft-cited dicta from its prior decision in Shallal v. Catholic Soc. Serv. of Wayne Cnty., 455 Mich. 604, 566 N.W.2d 571, 579 (1997), in which the court held that “[t]he primary motivation of an employee pursuing a whistleblower claim must be a desire to inform the public on matters of public concern, and not personal vindictive *353 ness,” and suggested that the employee must act "out of an altruistic motive of protecting the public.” Whitman, 831 N.W.2d at 233 (footnote, citation and internal quotation marks omitted).

. Although the Michigan courts have applied the continuing violations doctrine to WPA claims, see Phinney v. Perlmutter, 222 Mich. App. 513, 564 N.W.2d 532, 551-52 (1997), its application is now doubtful in light of the Michigan Supreme Court’s decision in Garg v. Macomb Cnty. Cmty. Mental Health Servs., 472 Mich. 263, 696 N.W.2d 646, 662 (2005), in which die court broadly declared that "the 'continuing violations’ doctrine is contrary to the language of [the Michigan Civil Rights Act, M.C.L. 600.5805] and ... therefore, ... the doctrine has no continued place in the jurisprudence of this state.” The Garg court did not explicitly overrule Phinney, but in subsequent decisions, the Michigan Court of Appeals has extended that prohibition to WPA claims. See Wafer v. Outdoor Adventures, Inc., No. 294985, 2011 WL 240697, at *1 (Mich.Ct. App. Jan. 25, 2011) (unpublished), and Moyer v. Comprehensive Rehabilitation Center, Inc., No. 292061, 2010 WL 3604680, at *3 (Mich. Ct.App. Sept. 16, 2010) (unpublished); see also Jones v. City of Allen Park, 167 Fed.Appx. 398, 404-05 (6th Cir.2006) (observing in the context of a WPA claim that the viability of the continuing violations doctrine in Michigan has been called into doubt since the Garg decision).

. See Cuddington, 826 N.W.2d at 527 (“[A] cause of action for retaliatory discharge cannot be based on the anticipated exercise of a right afforded under the Act.”); Griffey v. Prestige Stamping, Inc., 189 Mich.App. 665, 473 N.W.2d 790, 792 (1991) (MCL 418.301(13) “prohibitfs] discharge in retaliation for having filed a workers' compensation claim, not for the anticipated filing of such a claim”); Wilson v. Acacia Park Cemetery Ass'n, 162 Mich.App. 638, 413 N.W.2d 79, 83 (1987) ("[R]etaliatory discharge premised upon the employer’s anticipation of a future claim does not state a legally cognizable cause of action [under the WDCA].”).